Filed 10/14/14  (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MILLVIEW COUNTY WATER DISTRICT et al., | A139481 |
| Plaintiffs and Respondents, | (Mendocino County Super. Ct. No. SC UK CVPT 1259715) |
| v. | |
| STATE WATER RESOURCES CONTROL BOARD, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant; | [NO CHANGE IN JUDGMENT] |
| SONOMA COUNTY WATER AGENCY, et al. | |
| Interveners and Appellants. | |

BY THE COURT:

It is ordered that the opinion filed herein on September 11, 2014, be modified as follows:

1.  On page 6, in the first partial paragraph, the first full sentence beginning, "In May 2013," is amended by substituting the phrase "a written statement of decision" for the phrase "an order."  The amended sentence reads:

> In May 2013, the trial court issued a written statement of decision granting the requested writ.

2.  On page 6, in the first partial paragraph, the third full sentence beginning, "In an oral statement," is deleted in its entirety.

3.  On page 12, footnote 10 is amended to read as follows:

> [10] While the trial court recognized its obligation to exercise independent judgment on the evidence, it adopted the "introduction and summary" in

Millview's memorandum of law and made no factual findings of its own. The parties have pointed to no material conflict in the evidence supporting the Board's action, and, as discussed in detail below, the arguments of the parties raise primarily legal issues, to which we apply a de novo standard of review. (*Cassidy v. California Bd. of Accountancy, supra,* 220 Cal.App.4th at pp. 626–627.)

4. On page 19, in the first full paragraph, the second sentence of beginning "In a footnote," is amended by changing the phrase, "drawing they prepared" to "drawing the SCWA prepared." The amended sentence reads:

> In a footnote in their brief, plaintiffs claim the place of use of the Waldteufel claim was the entirety of Lot 103, rather than merely the Waldteufel parcel, but the "evidence" they cite for the assertion is merely a drawing the SCWA prepared for the hearing, unsupported by any actual testimony or documentary evidence of historic water use.

5. On page 27, in the first full paragraph, at the end of the third sentence beginning, "Notwithstanding his posted notice," add as footnote 23 the following footnote, which will require renumbering of all subsequent footnotes:

> [23] In a petition for rehearing, Millview argues Waldteufel could have perfected an appropriative right by use of water on riparian lands merely by expressing an intent that his use be considered appropriative. In support, Millview cites only *Rindge v. Crags Land Co.* (1922) 56 Cal.App. 247, in which the plaintiff acquired appropriative rights by use of water on riparian land while the land was owned by the federal government, prior to her later acquisition of it. (*Id.* at p. 252.) *Rindge* held that the appropriative rights survived the purchase, although they resulted in no expansion of the plaintiff's riparian rights. (*Ibid.*) *Rindge* concerns only such earlier acquired appropriative rights and contains no suggestion that a person who already owns riparian land can acquire appropriative rights by use of water on that land. Such a holding would be entirely inconsistent with the rules governing perfection of an appropriative right under California water law.

6. On page 32, add the following sentence at the end of part III:

> The parties shall bear their own costs on appeal.

2

There is no change in the judgment.

The petitions for rehearing of appellant Sonoma County Water Agency and respondents Millview County Water District, Steven Gomes, and Thomas Hill are denied. Dated:

_____
Margulies, Acting P. J.

Filed 9/11/14  (unmodified version)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MILLVIEW COUNTY WATER DISTRICT et al., | |
| Plaintiffs and Respondents, | A139481 |
| v. | (Mendocino County Super. Ct. No. SC UK CVPT 1259715) |
| STATE WATER RESOURCES CONTROL BOARD, | |
| Defendant and Appellant; | |
| SONOMA COUNTY WATER AGENCY et al., | |
| Interveners and Appellants. | |

In 2001, plaintiff Millview County Water District (Millview) began diverting water from the Russian River under the authority of a pre-1914 appropriative water right assigned to Millview by plaintiffs Thomas Hill and Steven Gomes.  On the basis of a citizen complaint, and following an evidentiary hearing, defendant State Water Resources Control Board (Board) issued a cease and desist order (CDO) substantially restricting Millview's diversion of water under the right, finding it had been largely forfeited by a period of diminished use from 1967 through 1987.

Millview, Hill, and Gomes (together, plaintiffs) filed a petition for a writ of mandate requiring the Board to set aside the CDO, contending, among other things, the Board lacked jurisdiction to limit appropriation under a pre-1914 water right and the evidence did not support the Board's finding of a forfeiture because there was no evidence of a timely adverse claim of use.  The trial court accepted the arguments and granted the writ.

We affirm the trial court's issuance of a writ directing the Board to set aside its decision, although on narrower grounds. We conclude the Board does have jurisdiction under Water Code[1] section 1831 to issue a CDO precluding excessive diversion under a pre-1914 right to appropriate and the Board properly determined the original perfected scope of the claim. We conclude, however, the Board applied an incorrect legal standard in evaluating the forfeiture of Millview's claimed water right and, applying the proper legal standard, the evidence before the Board was insufficient to support a finding of forfeiture. We remand to the Board for reconsideration in light of our decision.

## I. BACKGROUND

Millview is a county water district formed to supply water service in an unincorporated area of Mendocino County. In February 2006, a private citizen filed a complaint with the Board, contending that a water right claimed by Millview to support its diversion of water from the Russian River did not authorize the diversion because the right was (1) riparian rather than appropriative and (2) forfeited by long nonuse. Following an investigation, the Board's Division of Water Rights (Division) issued a memorandum concluding Millview's water right, which we will refer to as the "Waldteufel claim," was a valid pre-1914 appropriative right, but the Division agreed use rights under the Waldteufel claim had been largely forfeited. In April 2009, the Board issued a notice of a proposed CDO limiting Millview's diversion of water under the Waldteufel claim to a maximum rate of 1.1 cubic feet per second (cfs) and a total volume of 15 acre feet per year (afa). Hill and Gomes, who had assigned the Waldteufel claim to Millview, and Millview disputed the Board's conclusions and requested a hearing on the proposed CDO.

The evidence presented to the Board demonstrated the Waldteufel claim originated in connection with a 165-acre Mendocino County parcel referred to as "lot 103 of the Rancho Yokayo" (Lot 103). Lot 103 was bounded on one side by the west fork of the Russian River and located just north of the conjunction of the river's east and west forks

---

[1] All statutory references are to the Water Code unless otherwise indicated.

to form the main stem of the river.  In 1913, one J.A. Waldteufel acquired a 33.88-acre parcel subdivided from Lot 103 (Waldteufel parcel), also bounded on one side by the west fork of the river.

The next year, on March 24, Waldteufel recorded a notice of appropriation of water, claiming "One Hundred (100) inches measured under a four inch pressure" for domestic and agricultural use "upon the lands owned by me, . . . contiguous to [the Russian River] . . . on Lot #103 of Healeys survey and Map of Yokayo Rancho."  The Board accepted that this rate of diversion represented a maximum annual volume of approximately 1,450 afa.  Waldteufel's notice stated that a copy had been posted "at the point of intended diversion" on the west fork of the river.  A local resident, born in 1914, recalled subsequent owners of the Waldteufel parcel pumping water from the river for "at least 50 years" to irrigate alfalfa and tree crops.[2]  Plaintiffs submitted testimony from an expert who estimated that, in 1913, a grower would have used between 932 and 1,310 afa, applied between April and October, to irrigate a 165-acre crop of alfalfa.

The Waldteufel parcel passed through several hands before being acquired by Lester and Bertha Wood in 1945.  Between 1967 and 1987, Lester Wood filed statements of water diversion and use with the Board, typically claiming water use equivalent to between 7.5 and 15 afa to irrigate 30 acres of grapes and walnuts.  Historic river flow data suggest the Woods' diversions were not limited by the supply of available water.  The Waldteufel parcel appears to have remained in the Wood family until it was sold to Hill and Gomes in 1998.[3]  There is no data in the record regarding the volume of diversion under the Waldteufel claim for any other period before the beginning of Millview's diversions.

---

[2] The remnants of an appropriately sized steel pipe are still present near Waldteufel's stated point of diversion.

[3] The Waldteufel parcel was deeded to a trust by Lester and Bertha Wood.  Robert Wood became the successor trustee in 1988 and eventually transferred the property to his own trust, before deeding it to Hill and Gomes.

In 2002, Hill and Gomes assigned the Waldteufel claim to Millview, with an option to purchase that Millview later exercised. Millview constructed a new point of diversion in the main stem of the Russian River, downstream from the confluence of the two forks, where the flow of water is greater and more reliable than on the west fork.[4] Because Millview diverted water year-round to supply homes, including both homes constructed on the Waldteufel parcel and those elsewhere within Millview's boundaries, it expanded the nature and location of water use and the timing of diversions, compared with the prior owners, who appear to have used the claim primarily for agricultural purposes in the dry season. During the years for which information is available in the record, 2001 through 2008, Millview's diversions varied from a low of 3.76 acre-feet in the first year to a high of 1,174.75 acre-feet in the year prior to the filing of the citizen complaint.

The lower Russian River is a managed water system. Water that would otherwise flow into the river during the rainy season is retained and stored in two reservoirs managed by the Sonoma County Water Agency (SCWA). During the dry portion of the year, the SCWA releases water to maintain minimum river flow levels established in standards adopted by the Board. In theory, at least, any excess diversion of water by Millview during the dry season must be compensated by increased water releases from these dams to maintain the minimum flow level. In an order apparently issued in 1998, the Board had determined the west and east forks of the Russian River and "a portion of the mainstem within Mendocino County" are fully appropriated from July 1 to October 31.[5]

Based on this evidence, the Board issued a CDO limiting Millview's diversion under the Waldteufel claim to 15 afa, taken only during the period April through September. Relying on the evidence discussed above, the Board concluded there was no

---

[4] Unlike west fork flows, which come solely from natural sources, east fork flows are supplemented in the dry season by reservoir releases.

[5] We have not found a copy of this order in the record, but it is entitled "Order WR 98-08," which suggests an issuance date in 1998.

4

evidence Waldteufel used the diverted water on any property other than the 33.88-acre parcel he purchased in 1913. As a result, the Board noted, "it does not appear" that the Waldteufel claim was ever perfected as a right of appropriation, since Waldteufel's use of water for irrigation on the Waldteufel parcel would have been allowed by the riparian rights available to a parcel adjoining the river. While a finding to this effect would have precluded any appropriation under the claim, the Board did not base its order on this theory because its notice of a proposed CDO did not raise as an issue the validity of the Waldteufel claim. The Board's decision did, however, caution that "the validity of the Waldteufel claim of right in its entirety is questionable."

Accepting the Waldteufel claim as appropriative, the Board found plaintiffs had failed to prove Waldteufel had ever actually diverted or used the maximum claimed volume of approximately 1,450 afa. The Board found reasonable Millview's expert evidence regarding the volume of irrigation water that would have been used to irrigate alfalfa in Waldteufel's day, but because it found no evidence he had actually irrigated more than the 33.88-acre parcel he purchased, rather than the full 165 acres of Lot 103 as assumed by the expert, the Board reduced the estimate of Waldteufel's total use proportionately. By assuming the expert's rate of irrigation was used on the smaller parcel, the Board found actual use of between 173 afa and 243 afa, diverted from April through early October. However, the Board further found from evidence of the Wood family's usage that any perfected volume above 15 afa, the maximum documented annual usage by Wood over 20 years, had been forfeited due to nonuse. Given the change in location of the point of diversion, the change in the purpose for the diversion, Millview's service area of 8 to 10 square miles, and Millview's actual diversions in excess of 15 afa, the Board concluded there was a risk Millview would exceed the authorized volume of diversion under the Waldteufel claim. The Board also found excess diversion would be harmful to other users, given the complete appropriation of the river during the months available for diversion under the claim.

Millview, Hill, and Gomes filed a petition for a writ of mandate requiring the Board to set aside the CDO. The trial court granted motions to intervene by appellants

5

SCWA and Mendocino County Russian River Flood Control and Water Conservation Improvement District (Mendocino District). In May 2013, the trial court issued an order granting the requested writ. The court concluded, without explanation, that the Board abused its discretion because "the findings essential to the cease and desist orders are not supported by the weight of the evidence" and "proceeded without or in excess of its jurisdiction in issuing the cease and desist orders." In an oral statement of decision, the trial court effectively declined to explain these rulings further. The Board, SCWA, and Mendocino District have appealed the court's judgment.

## II. DISCUSSION

### A. *Legal Background*

#### 1. *Water Rights in California*

Ownership of California's water is vested generally in the state's residents, but individuals and entities can acquire "water rights," the right to divert water from its natural course for public or private use. (§ 102; see generally *United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 100 (*United States*).) California maintains a "dual system" of water rights, which distinguishes between the rights of "riparian" users, those who possess water rights by virtue of owning the land by or through which flowing water passes, and "appropriators," those who hold the right to divert such water for use on noncontiguous lands.[6] (*El Dorado Irrigation Dist. v. State Water Resources Control Bd.* (2006) 142 Cal.App.4th 937, 961 (*El Dorado*).) For historical reasons, California further subdivides appropriators into those whose water rights were established before and after 1914.[7] Post-1914 appropriators may possess

---

[6] The dual system is a fusion of the English common law and the informal rules developed by miners to govern their diversion of water from public lands in the early days of statehood. (See *Pleasant Valley Canal Co. v. Borror* (1998) 61 Cal.App.4th 742, 751–754 [excellent summary of the development of California water law].)

[7] In 1913, the Legislature enacted the Water Commission Act (Stats. 1913, ch. 586, p. 1012), landmark legislation that, among other provisions, required any new appropriations to occur by permit. Appropriations established prior to the Act's effective

6

water rights only through a permit or license issued by the Board, and their rights are circumscribed by the terms of the permit or license. Riparian users and pre-1914 appropriators need neither a permit nor other governmental authorization to exercise their water rights. (*California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 428–429 (*Farm Bureau*).)

The nature of the water rights held by riparian users and appropriators differ in several ways. Most pertinent to the matter at hand are the limits placed on diversion. Although riparian users must share with other riparian users on the watercourse, there is no predetermined limit on the amount of water an individual riparian user may divert, so long as the uses to which the diverted water is put are riparian, beneficial, and reasonable. (See *Phelps v. State Water Resources Control Bd.* (2007) 157 Cal.App.4th 89, 116, 118–119 (*Phelps*) [explaining criteria for "riparian" use].) Appropriators, in contrast, may divert only so much water as is authorized by their particular water right. (*Pleasant Valley Canal Co. v. Borror, supra*, 61 Cal.App.4th at p. 776.) For pre-1914 appropriators, that volume is determined by historical use, as discussed in more detail below. For post-1914 appropriators, who possess no diversion rights apart from those granted by the Board, the limit on their water usage is established by their permit. (§ 1455.)

In addition, appropriators must "use it or lose it." "[D]ue to the scarcity of water generally in California, its societal importance, and the peculiar nature of common and multiple rights to water from the same watercourse, the courts have recognized that water rights may be forfeited through nonuse under certain circumstances." (*North Kern Water Storage Dist. v. Kern Delta Water Dist.* (2007) 147 Cal.App.4th 555, 559 (*North Kern II*).) Under section 1241, which codifies these common law rulings, if an appropriator fails beneficially to use all or a portion of the appropriated water for a period of five years, "that unused water may revert to the public and shall, if reverted, be

---

date in December 1914 were grandfathered. (See generally *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 741–742.)

regarded as unappropriated public water." In the event of such a forfeiture, the maximum volume of water available for use by the appropriator is reduced by the volume found to be forfeited, up to the entire claim. (See *North Kern II,* at p. 583.) Riparian users are not subject to a similar rule. (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 347, 358.)

The two types of rights holders are also treated differently when the available supply of water is insufficient to satisfy the needs of all those holding water rights in a particular watercourse. Under the "rule of priority," which governs water use in such circumstances, the rights of riparian users are paramount. Although riparian users must curtail their use proportionately among themselves in times of shortage, they are entitled to satisfy their reasonable needs first, before appropriators can even begin to divert water. (*United States, supra*, 182 Cal.App.3d at p. 104.) As a result, appropriators may be deprived of all use of water when the supply is short. In turn, senior appropriators— those who acquired their rights first in time—are entitled to satisfy their reasonable needs, up to their full appropriation, before more junior appropriators are entitled to any water. (*Id.* at pp. 104–105; *North Kern II, supra*, 147 Cal.App.4th at p. 561.)

Finally, water use by both appropriators and riparian users is limited by the "reasonable use" doctrine, which forbids the waste of water or its unreasonable use. (Cal. Const., art. X, § 2 (Article X, Section 2); *Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1479–1480 (*Light*).) Because the Board did not claim Millview's use of diverted water was unreasonable, we will have little occasion to address the doctrine here.

### 2. *Pre-1914 Appropriation Rights*

Prior to the December 1914 effective date of the Water Commission Act (Stats. 1913, ch. 586, p. 1012), there were two ways to establish a right to appropriate water from a California watercourse.[8] The first dated to statehood: to begin diverting

---

[8] Although passed in 1913, the Water Commission Act was "held up by referendum and did not go into effect until December 1914." (*Irrigation Dist. v. Mt. Shasta P. Corp.* (1927) 202 Cal. 56, 66.)

water and applying it to a beneficial use.  (*N. C. & S. C. Co. v. Kidd* (1869) 37 Cal. 282, 311–312.)  Once a would-be diverter took some act manifesting an intent to appropriate water, he or she established a claim to the volume of water reasonably necessary to serve the purpose for which the diversion was sought.  So long as the diverter acted with due diligence to achieve the intended diversion, did in fact divert within a reasonable time, and used the diverted water for a beneficial purpose, the claim was perfected and had priority over any later established claim.  (*Haight v. Costanich* (1920) 184 Cal. 426, 431–433.)  The second method, illustrated by Waldteufel's conduct, became available with the 1872 passage of Civil Code sections 1415 through 1421.  A person intending to establish a claim of appropriation was required to post a notice at the intended point of diversion and to record a copy of the notice with the county.  (Civ. Code, § 1415.)  The claim became entitled to priority upon commencement of the diversion.  (Civ. Code, §§ 1416–1418.)  Under both types of claims, the right to appropriate was limited to the amount of water actually put to a beneficial use by the diverter, rather than the amount claimed or diverted.  (*Hufford v. Dye* (1912) 162 Cal. 147, 153; *Duckworth v. Watsonville W. etc. Co.* (1910) 158 Cal. 206, 210–211.)

As noted above, pre-1914 appropriation rights are subject to forfeiture for nonuse.  Although there is some uncertainty whether section 1241 applies to pre-1914 rights, since it refers to water rights granted by the Board, an identical five-year rule of forfeiture was historically applied to pre-1914 rights under a statutory predecessor to section 1240.[9]  (See *Smith, supra*, 110 Cal. at p. 127.)  As the policy underlying the forfeiture of appropriative water rights was explained in *Smith*:  "Considering the necessity of water in the industrial affairs of this state, it would be a most mischievous perpetuity which would allow one who has made an appropriation of a stream to retain indefinitely, as against other appropriators, a right to the water therein, while failing to apply the same to some

---

[9] Section 1240 states:  "The appropriation must be for some useful or beneficial purpose, and when the appropriator or his successor in interest ceases to use it for such a purpose the right ceases."  The Supreme Court imposed a requirement of five years of nonuse.  (*Smith v. Hawkins* (1895) 110 Cal. 122, 127 (*Smith*).)

useful or beneficial purpose. Though during the suspension of his use other persons might temporarily utilize the water unapplied by him, yet no one could afford to make disposition for the employment of the same, involving labor or expense of any considerable moment, when liable to be deprived of the element at the pleasure of the appropriator, and after the lapse of any period of time, however great." (*Id.* at p. 127.) The burden of proof of the elements of forfeiture lies with the party asserting forfeiture. (*Ward v. City of Monrovia* (1940) 16 Cal.2d 815, 820.)

### 3. *The State Water Resources Control Board*

The Board was created as the State Water Commission in 1913 to administer the appropriation of water for beneficial purposes. As originally created, the Board had the "limited role" of granting use rights to water that was not being applied to beneficial purposes and was not otherwise appropriated. (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 442 (*Audubon Society*).) "[T]he function of the Water Board was restricted to determining if unappropriated water was available; if it was, and no competing appropriator submitted a claim, the grant of an appropriation was a ministerial act." (*Ibid.*) By imposing a reasonableness requirement on the exercise of water rights, the 1928 enactment of the predecessor of Article X, Section 2 "radically altered water law in California and led to an expansion of the powers of the board." (*Audubon Society*, at p. 442.) Through subsequent legislation and judicial decisions, "the function of the Water Board has steadily evolved from the narrow role of deciding priorities between competing appropriators to the charge of comprehensive planning and allocation of waters." (*Id.* at p. 444.)

As currently constituted, the Board "has been granted broad authority to control and condition water use, insuring utilization consistent with public interest." (*Environmental Defense Fund, Inc. v. East Bay Mun. Utility Dist.* (1977) 20 Cal.3d 327, 342.) Its enabling statute, section 174, describes the Board's function as "to provide for the orderly and efficient administration of the water resources of the state" and grants it the power to "exercise the adjudicatory and regulatory functions of the state in the field of water resources." (*Id.*, subd. (a).) In that role, the Board is granted "any powers . . .

10

that may be necessary or convenient for the exercise of its duties authorized by law." (§ 186, subd. (a).)  The particular power exercised by the Board in this matter is governed by section 1831, which permits the Board to issue a CDO, after notice and the opportunity for a hearing, "in response to a violation or threatened violation" of (1) "[t]he prohibition . . . against the unauthorized diversion or use of water subject to this division"; (2) any term or condition of a water permit; or (3) an order of the Board.  (*Id.*, subds. (c), (d)(1)–(3).)

### 4.  *Review of Board Decisions*

Trial court review of Board CDO is conducted pursuant to Code of Civil Procedure section 1094.5, exercising "independent judgment on the evidence."  (§ 1126, subd. (c).)  This review was explained in *Phelps*:  "Code of Civil Procedure section 1094.5 governs judicial review of water right orders issued by the [Board].  [Citation.] The trial court's inquiry in such a challenge 'shall extend to the questions whether the [Board] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.  Abuse of discretion is established if the [Board] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence. [¶] . . . Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. . . .'"  (*Phelps, supra,* 157 Cal.App.4th at pp. 98–99.)  When, as here, the trial court is directed to conduct an independent review of administrative findings, "we review the record to determine whether the court's factual findings are supported by substantial evidence, resolving all evidentiary conflicts and drawing all legitimate and reasonable inferences in favor of the court's decision. [Citations.] . . . '[T]o the extent pure questions of law (e.g., jurisdiction) were decided at the trial court upon undisputed facts, a de novo standard will apply at the appellate

11

level.' " (*Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 627, fn. omitted.)[10]

## B. *The Board's Jurisdiction*

In ruling the Board acted in excess of its jurisdiction in entering the CDO, the trial court apparently accepted plaintiffs' argument that the Board lacks jurisdiction to issue a CDO with respect to water diverted pursuant to a pre-1914 right of appropriation. Appellants contend, and we agree, the trial court's ruling was erroneous on this point.

In a decision rendered after entry of the trial court's order, *Young v. State Water Resources Control Bd.* (2013) 219 Cal.App.4th 397 (*Young*), the Third District resolved this issue in favor of jurisdiction. In *Young,* the Board had issued a draft CDO challenging the right of a "water distribution corporation" in the Sacramento-San Joaquin River Delta to divert water. After the corporation provided evidence it possessed a pre-1914 right to appropriate, the Board issued a CDO limiting the corporation's diversion to the amount allowed by that right. (*Id.* at pp. 401–402.) The petitioners, customers of the corporation, successfully sought a writ of mandate, arguing the "Water Code does not provide the authority to the [Board] to adjudicate the validity, the extent, or the forfeiture of riparian or pre-1914 appropriative rights." (*Id.* at p. 403.) The court acknowledged the long-standing rule that the Board "does not have jurisdiction to regulate riparian and pre-1914 appropriative rights." (*Id.* at p. 404.) Yet it also noted the Board " 'does have authority to prevent illegal diversions and to prevent waste or unreasonable use of water, regardless of the basis under which the right is held.' " (*Ibid*.) The court harmonized these potentially conflicting principles by noting a permit is required for the diversion of certain categories of water and the Board has the authority under section 1831 to issue a cease desist order against the unpermitted diversion of such water. Included among the

---

[10] The trial court made no factual findings and did not otherwise explain the basis for its ruling, making it difficult to determine whether the court followed the statutory direction to apply its independent judgment to the Board's factual findings. It makes no difference to our review because, as discussed in detail below, the arguments of the parties raise primarily legal issues, to which we apply a de novo standard of review. (*Cassidy v. California Bd. of Accountancy, supra,* 220 Cal.App.4th at pp. 626–627.)

12

categories requiring a permit are "water subject to a pre-1914 right but that was not perfected by putting the water to beneficial use with due diligence [citation], and water for which a right had been perfected by putting the water to use under a pre-1914 right but where the use later ceased." (*Young*, at p. 404.) Accordingly, *Young* reasoned, "to determine whether the diversion and use of water is unauthorized, it is necessary to determine whether the diversion and use that the diverter claims is authorized by riparian or pre-1914 appropriative rights. The [petitioners'] argument that the Water Board lacks jurisdiction to adjudicate claims of riparian or pre-1914 appropriative rights is flawed because it begs the question central to the appeal, namely, whether a given diversion claimed to be authorized is in fact authorized by a valid riparian or pre-1914 appropriative right. If it is not, the diversion is unauthorized and subject to enforcement pursuant to Water Code sections 1052 and 1831 . . . ." (*Id.* at p. 406.)

*Young*'s reasoning is straightforward and persuasive. In order to exercise the authority given to it under section 1831 to prevent unauthorized diversion of water, the Board necessarily must have jurisdiction to determine whether a diverter's claim under a pre-1914 right of appropriation is valid. Here, in arguing to the contrary, plaintiffs point to section 1831, subdivision (e), which states: "This article shall not authorize the board to regulate in any manner, the diversion or use of water not otherwise subject to regulation of the board under this part." This subdivision, however, is subject to the same argument. Necessarily, as *Young* noted, only water diverted under a *valid* pre-1914 water right is protected from such regulation; a permit *is* required to divert water appropriated pursuant to a claimed pre-1914 water right that was never perfected, or has been forfeited, or is otherwise invalid. (*Young, supra*, 219 Cal.App.4th at p. 404.) Because section 1831, subdivision (e) does not protect from regulation water purportedly diverted under a claimed pre-1914 right that does not actually authorize such diversion, the subdivision does not preclude the Board from determining the proper scope of a claimed

13

pre-1914 right.[11] (See *Temescal Water Co. v. Dept. Public Works* (1955) 44 Cal.2d 90, 103–104 [Board has jurisdiction to determine whether unappropriated water exists as a prerequisite to issuance of a permit for appropriation].) Any other rule would permit a diverter to place his or her diversion beyond Board regulation merely by *claiming* to possess, as opposed to validly possessing, a pre-1914 water right.

Plaintiffs argue *Young* holds only that the Board can make the preliminary determination of whether a claimed pre-1914 right of appropriation was validly established, not the further issue of the scope of the right granted. While it is true the only issue directly raised by the facts in *Young* was the existence of the pre-1914 right, the court's rationale, as the opinion itself recognized (*Young, supra*, 219 Cal.App.4th at p. 403), grants the Board the authority to determine the scope of a claimed right as well as its existence. Section 1831 allows the Board to issue an order preventing the unauthorized diversion of water. Unauthorized diversion includes not merely the diversion of water under a claimed but invalid pre-1914 right, but also diversion beyond the proper scope of a valid pre-1914 right, whether because the diversion exceeds the maximum perfected amount of water under the right or because an intervening forfeiture has reduced the proper scope. The Board therefore possesses the jurisdiction to determine all of these issues.

Plaintiffs' further argument that the Board must file a judicial proceeding to determine the proper scope of a pre-1914 water right is both inconsistent with the plain language of section 1831 and unsupported by relevant authority. Plaintiffs cite only *People ex rel. State Water Resources Control Bd. v. Forni* (1976) 54 Cal.App.3d 743 (*Forni*), a decision rejecting the argument the Board lacks jurisdiction to regulate unreasonable riparian water use. (*Id.* at pp. 751–752.) *Forni* did suggest, somewhat inconsistently, that courts must make a final determination of unreasonable use (*id.* at

---

[11] The same argument refutes plaintiffs' argument that section 1831 should be construed to avoid the risk of conflict with Article X, Section 2, which prohibits regulation of riparian and pre-1914 water rights. The Board does not "regulate" those rights by determining whether they exist and, if so, their proper scope.

14

p. 752), but we have recently rejected that conclusion.  (See *Light*, *supra*, 226 Cal.App.4th at pp. 1483–1484 [holding that *Forni* construed the Board's authority "too narrowly"].)  In any event, *Forni* concerned a determination of unreasonable use under Article X, Section 2.  The Board in this case did not rest the issuance of the CDO on a finding of unreasonable use.  Rather, it found Millview's diversion in excess of 15 afa to be unauthorized by its water rights claim, thereby bringing the determination directly within the scope of the plain language of section 1831, which permits the Board to make such a determination without judicial intervention.  *Forni* had no occasion to address either illegal use or section 1831, which did not exist when the case was decided in 1976.

The Legislature's intent to expand the Board's authority into territory formerly occupied by the courts is made clear from the progression of legislation in this area.  As originally enacted in 1980, section 1831 allowed the Board to issue a CDO only against violations of the terms of a permit, leaving other types of misuse of water outside the Board's presumed CDO authority.  (Stats. 1980, ch. 933, § 13, p. 2958.)  When the Legislature expanded section 1831 by amendment in 2002 (Stats. 2002, ch. 652, § 6, pp. 3604–3605), it added subdivision (d)(1), which expressly authorizes the Board to issue a CDO against violations of "[t]he prohibition set forth in Section 1052 against the unauthorized diversion or use of water . . . ."  At the time, although section 1052 directed the Board to prevent the unauthorized diversion of water, the Board could do so only by requesting the Attorney General to commence an action to enjoin such diversion. (§ 1052, subd. (b).)[12]  Subdivision (d)(1) of section 1831 therefore expanded the Board's

---

[12] Prevention of unauthorized diversions under section 1052 included the improper diversion of water under asserted pre-1914 appropriative water rights.  (§ 1052, subd. (a); *Meridian, Ltd. v. San Francisco* (1939) 13 Cal.2d 424, 450 [addressing Board authority under § 38 of the Water Commission Act (Stats. 1913, ch. 586, § 38, p. 1032), the predecessor statute to § 1052].)

authority into the adjudication of unauthorized diversion, which was previously vested in the courts.[13]

## C. *The Original Perfected Scope of the Waldteufel Claim*

The Board's decision reached three separate conclusions, one of them only tentative, about the scope of the Waldteufel claim. As discussed above, the Board concluded the claim (1) was never perfected for more than 243 afa by Waldteufel, (2) had been reduced by forfeiture to 15 afa, and (3) might not be a proper claim of appropriation at all, since there was no evidence Waldteufel ever made appropriative use of water under the claim. In seeking to uphold the trial court's decision, plaintiffs contest all three of these conclusions. We begin with the Board's finding of the original perfected scope of the claim.

Plaintiffs contend the Board applied an incorrect legal standard in concluding the Waldteufel claim had never been perfected for diversion greater than 243 afa. In reaching its conclusion, the Board applied the long-standing rule that an appropriator acquires the right to divert no greater volume of water than he or she has actually put to beneficial use. As held in *Hufford v. Dye, supra*, 162 Cal. 147: "It is the well-settled law of this state that one making an appropriation of the waters of a stream acquires no title to the waters but only a right to their beneficial use and *only to the extent that they are employed for that purpose*. His right is not measured by the extent of his appropriation as stated in his notice or by his actual diversion from the stream, but by the extent to which he applies such waters for useful or beneficial purposes." (*Id.* at p. 153, italics added; *Haight v. Costanich*, *supra*, 184 Cal. 426, 431 ["The quantity of water to which a person becomes entitled by such diversion is not determined by the capacity of the ditch diverting the water; the extent of the right gained by the diversion is limited to the

---

[13] Like *Young*, *supra*, 219 Cal.App.4th at page 405, we find the language of section 1831 sufficiently unambiguous on this point as to preclude consideration of the legislative history proffered by plaintiffs. (See *Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1063, disapproved on other grounds in *People v. Harrison* (2013) 57 Cal.4th 1211, 1230, fn. 2 [use of extrinsic materials permitted only if language of statute is ambiguous].)

16

amount of water applied to a beneficial use . . . ."]; *Trimble v. Hellar* (1913) 23 Cal.App. 436, 443.)

Plaintiffs' argument that the Board misapplied the law depends upon a purported distinction between common law pre-1914 appropriation rights based on actual diversion and appropriation rights gained through the posting and recording of a notice under the Civil Code. Plaintiffs argue that while a common law claimant may gain a right to use a particular amount of water, a statutory claimant's right is measured not by the quantity diverted but by the rate of flow specified in the notice. Accordingly, they contend, Millview is entitled to divert the rate of flow specified by Waldteufel in his notice, "One Hundred (100) inches measured under a four inch pressure," at any time and for any duration Millview elects, resulting in potential annual diversion far greater than the 243-afa limit found by the Board.

The Civil Code provisions governing a notice of water rights claim do require a claimant to specify a rate of flow in the notice. (Civ. Code, § 1415.) Contrary to plaintiffs' contention, however, nothing in the Civil Code grants to the claimant the right to take this flow if, as they argue, "that flow is present and not subject to a prior right." On the contrary, while the Civil Code specifies the requirements for a claimant to bring the "works" to "completion" (Civ. Code, §§ 1416, 1417), it says nothing about the amount of water to which the claimant will be entitled if the works are completed. Plaintiffs equate "completion" under the Civil Code with perfection of a claim, but they cite no authority for the equivalence and make no argument to support this equivalence. In fact, the only legal significance of "completion" under the notice provisions appears to be to establish the priority of the claim against competing claims. Unless the noticed claim was actually "completed" within the meaning of the code, the claim did not relate back to the date of posting. (Civ. Code, § 1418.) The point was made explicitly in *Duckworth v. Watsonville W. etc. Co., supra*, 158 Cal. 206, in which the court noted: "Compliance with the sections of the code relative to appropriation are important only in so far as the claimant seeks to have his right relate back to the date of posting. [Citation.] Such compliance will cut off rights accruing between the date of posting and the actual

17

diversion for beneficial purposes. If no such rights have intervened, the actual appropriation may be made without following the provisions of the code." (*Id.* at p. 211.) Although the diverter's notice in *Duckworth* had claimed 250 inches, the court limited his water rights to the 142 inches he actually diverted and used. (*Id.* at pp. 210–211; see similarly *Trimble v. Hellar, supra*, 23 Cal.App. at pp. 443–444.) Accordingly, the enactment of the Civil Code provisions did not eliminate the need for actual perfection of a claim through beneficial use.

The sole case cited by plaintiffs in support of their claim that appropriations gained through notice are treated differently than those gained by actual diversion makes no such distinction. (*Simons v. Inyo Cerro Gordo Co.* (1920) 48 Cal.App. 524, 537–538 [holding "the most essential . . . element to the legal appropriation of water is its application within a reasonable time to some useful purpose of industry"].) Nor is such a distinction consistent with the policy underlying California water law. The notice system in the Civil Code provided diverters the opportunity to claim more water than they could actually use, a practice in tension with the objective of putting all water to beneficial use.[14] By limiting claims to the maximum amount of water a diverter actually used, the law ensured senior appropriators did not tie up the right to claimed but unused water.

Even if plaintiffs' legal argument had merit, they failed to provide the necessary evidentiary support for their claim before the Board. Their argument is premised on Waldteufel's claim to a flow of water "under a four-inch pressure," which they assert represented a flow rate of 2 cfs. As discussed above, however, the scope of a pre-1914 claim is not determined by the amount claimed or the amount diverted, but by the amount actually used by the claimant. Further, a claimant's use rights are limited to the season and even the time of day or week when the claimant actually used water. (*Bazet v.*

_____

[14] In a study performed in 1901, investigators found no less than six separate notices claiming all of the water of the San Joaquin River, and they estimated the aggregate of the claims in the state amounted to " 'enough moisture to submerge the continent.' " (1 Hutchins, Water Rights Laws in the Nineteen Western States (1971), at p. 295.)

*Nugget Bar Placers, Inc.* (1931) 211 Cal. 607, 616 [appropriator only acquired right to use water during time of year and time of day when actually used]; *Santa Paula Water Works v. Peralta* (1896) 113 Cal. 38, 42, 44 [diverter who used 50 inches of water once per week for 24 hours limited to such use by doctrine of forfeiture].) If plaintiffs were to acquire the right to divert a 2-cfs rate of flow at any time of day and year, as they now contend, they were required to demonstrate Waldteufel actually diverted this rate of flow in the same manner—in effect, whenever it was available. As discussed above, plaintiffs failed to prove Waldteufel's continuous diversion of 2 cfs; at most, they demonstrated Waldteufel's annual use of 243 afa, as the Board found.

As best we can determine, plaintiffs do not otherwise argue that the Board's determination of the maximum perfected scope of the Waldteufel claim constituted an abuse of discretion.[15] In a footnote in their brief, plaintiffs claim the place of use of the Waldteufel claim was the entirety of Lot 103, rather than merely the Waldteufel parcel, but the "evidence" they cite for the assertion is merely a drawing they prepared for the hearing, unsupported by any actual testimony or documentary evidence of historic water use.[16] Plaintiffs' argument from this exhibit is apparently that Waldteufel's supply of water to the remainder of Lot 103 can be inferred from the fact that the remainder was found to be in agricultural production at a much later point in time. There is no rational basis for such an inference. Even assuming the remainder of Lot 103 was used for agricultural purposes in Waldteufel's time, the logical inference is the owner would have drawn irrigation water from the river under the lot's own riparian rights, since it adjoined the river. Given the lack of evidence of the actual conditions, however, even that

---

[15] At the outset of their brief, plaintiffs state their intention to incorporate all of the arguments made in their pleadings before the trial court. Such incorporation is not permitted, and we have considered only the arguments made in their appellate brief. (See *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 294, fn. 20.)

[16] In their discussion of forfeiture, they also argue that other contemporary evidence, such as a purported conclusion reached by Division staff, constitutes evidence that Waldteufel irrigated the entirety of Lot 103. We have reviewed this evidence and conclude none of it provides the slightest indication of Waldteufel's actual water use.

inference would be no more than speculation. The record contains no direct evidence of Waldteufel's water use, and the only circumstantial evidence, the notice and deed, suggests Waldteufel irrigated only his own property. Accordingly, there is no basis for invalidating the Board's finding that the maximum perfected appropriation under the Waldteufel claim was 243 afa.

**D.** *The Board's Determination of Forfeiture*

For the reasons stated above, we find no error in the Board's conclusion that the maximum permissible diversion under the Waldteufel claim, based on the original perfected scope of the claim, is 243 afa. The Board's order did not allow Millview to divert 243 afa under the claim, however, but further reduced Millview's diversion to 15 afa, based on a finding of forfeiture. We now turn to this conclusion.

Plaintiffs contend the trial court's ruling should be affirmed because the Board's forfeiture finding was not supported by the evidence and resulted from the application of an incorrect legal standard. Relying on *North Kern II* and a prior nonpublished decision in the same action, *North Kern Water Storage Dist. v. Kern Delta Water Dist.* (Jan. 31, 2003, F033370) (*North Kern I*), plaintiffs argue (1) a forfeiture cannot occur in the absence of a "clash of rights," the assertion of a conflicting claim to the water rights in question, and (2) the five-year period for measuring the degree of forfeiture is the five years immediately preceding assertion of this conflicting claim. The Board, in contrast, based its ruling of forfeiture on water use two decades before the administrative proceeding, without evidence of the type of conflicting claim required by *North Kern II*. Because we agree the Board's forfeiture decision was not supported by evidence of the requisite clash of rights, we need not address plaintiffs' second contention.

The plaintiff in *North Kern I, supra*, F033370, sought a declaration that the defendant had forfeited a significant portion of its pre-1914 appropriative water rights. The entire natural flow of the subject watercourse, the Kern River, had been fully

20

appropriated and beneficially used since the late 1800's.[17]  Throughout much of that time, the defendant, which possessed the senior water rights, had used less water than available under its appropriative rights, but none of the many junior users had sought a judicial declaration of forfeiture.  In 1976, the defendant began to increase its historic water use, in the process diminishing the water available to the plaintiff, one of the junior users.[18] (*North Kern I, supra,* F033370.)  Given the long period of the defendant's nonuse, perhaps a century, the *North Kern I* court was required to identify the appropriate five-year period for measuring forfeiture.  The court rejected the defendant's argument that the relevant five-year period should be the five years preceding the filing of the lawsuit.  Reasoning that forfeiture is not "adjudicated in the abstract without the presence of a competing claim" and "the [five-year] period selected must bear a direct temporal relationship to the time the contrary claim was made," the court held that the five-year period ended no later than 1976, when the defendant first increased its use in a manner that diminished the water available to the plaintiff.  (*Ibid.*)  The matter was remanded for the selection of a specific five-year period.  (*Ibid*.)  *North Kern II* affirmed the trial court's application of *North Kern I*, which the trial court interpreted to require the assertion of a contrary claim through formal notice of the claimed forfeiture by the new claimant and a formal response by the original rights holder.  (*North Kern II*, *supra*, 147 Cal.App.4th at p. 566.)

We agree with plaintiffs and *North Kern I* that forfeiture of a water rights claim does not occur "in the abstract," merely because an appropriator uses less water than the maximum claimed appropriation for a five-year period.  (*North Kern I, supra,* F033370.)

---

[17] The California Rules of Court preclude our citation of a nonpublished decision except as "relevant under the doctrines of law of the case, res judicata, or collateral estoppel."  (Cal. Rules of Court, rule 8.1115(a) & (b)(1).)  Because *North Kern II* expressly relied on the statement of facts and legal reasoning of *North Kern I* without reiterating either in its opinion, we conclude that limited citation to *North Kern I* is permissible as necessary to explain the published rulings in *North Kern II*.

[18] We have considerably simplified the complex factual circumstances of *North Kern I, supra*, F033370, in an effort to isolate the facts pertinent to our concerns here.

As that court recognized, what is required for forfeiture is not merely nonuse by the rights holder of its full appropriation, but also "the presence of a competing claim" to the unused water by a rival diverter who is prepared to use, or is using, the surplus. (*Ibid.*) Although the principle appears not to be announced explicitly by earlier California decisions, we have not located any finding of a forfeiture in the absence of an existing or potential competing claim.[19] Perhaps more to the point, there is no policy reason for finding a forfeiture until an alternative use has been asserted. The purpose of the forfeiture doctrine is to free unused water for beneficial use. (See, e.g., *Joerger v. Pacific Gas & Electric Co.* (1929) 207 Cal. 8, 22; *Smith, supra,* 110 Cal. at p. 127.) If no other beneficial use for the surplus water has been asserted, there is no reason to find a forfeiture.

While we agree forfeiture requires a conflicting claim, the requisite form of that conflicting claim is a separate question, and on this issue we part ways with *North Kern II.* The requirement in *North Kern II, supra,* 147 Cal.App.4th at pages 560, 566, that the conflicting claim consist of a formal notice communicated to the rights holder and a response by the rights holder was imposed primarily as a means for determining the timing of the five-year period in a very complex set of circumstances. While the requirement may have been appropriate in that factual setting, there is no authority to support its imposition in all circumstances. On the contrary, prior decisions have demonstrated far more flexibility, requiring no particular manner of asserting a

---

[19] The cases are too numerous to list in the text. As examples, see generally *Bazet v. Nugget Bar Placers, Inc., supra,* 211 Cal. at pages 617–618 (defendant forfeited right to stored and unused water when others were willing to use water); *Lindblom v. Round Valley Water Co.* (1918) 178 Cal. 450, 452 (plaintiff purchased land below dam and was prepared to use excess water); *Hufford v. Dye, supra*, 162 Cal. 147, 150 (defendant prepared to use water claimed to have been forfeited by plaintiff); *Santa Paula Water Works v. Peralta, supra,* 113 Cal. at pages 42–43 (plaintiff had used defendant's unused water for nearly 20 years); *Smith*, *supra*, 110 Cal. at page 127 (forfeiture prohibits retention of rights "as against other appropriators").

22

conflicting claim beyond adverse appropriation and use of the surplus water.[20]  Further, the *North Kern II* ruling appears to rest on a legally flawed premise.  The court based its imposition of the formal claim requirement on its conclusion that any water use by an adverse claimant prior to the assertion of such a formal claim was "permissive" by the original water rights holder and therefore could not constitute a basis for forfeiture.  (*Id.* at p. 567.)  This analysis conflates the concepts of adverse possession and forfeiture, which are separate and independent doctrines.  We have found no authority for the court's holding that a forfeiture cannot occur if an adverse claimant's use would qualify as permissive under the law of adverse possession.  On the contrary, section 1241 declares a forfeiture after five years of nonuse, without regard for the permissiveness of any actual adverse use.  Prior decisions have never imposed such a requirement; rather, they have expressly distinguished forfeiture from the doctrines of abandonment and adverse possession.  (See, e.g., *Smith, supra,* 110 Cal. at p. 126 [doctrine of forfeiture "deals with the forfeiture of a right by nonuser alone"].)  There would be no role for the doctrine of forfeiture if it merely reiterated the requirements of adverse possession.

In determining the nature of a conflicting claim in the circumstances presented here, we find instructive an Idaho decision, *Sagewillow v. Idaho Dept. of Water Res.* (Idaho 2003) 70 P.3d 669 (*Sagewillow*), which the *North Kern II* court declined to consider.[21]  Idaho statutory law contains a forfeiture provision essentially identical to

---

[20] In *Smith, supra*, 110 Cal. at pages 127–128 and its subsequent decision, *Smith v. Hawkins* (1898) 120 Cal. 86, 88, and in *Lindblom v. Round Valley Water Co.*, *supra*, 178 Cal. at page 456, the courts measured forfeiture from the date of filing of a lawsuit brought to settle the water rights.  (See also *Gray v. Magee* (1930) 108 Cal.App. 570, 579.)  In *Santa Paula Water Works v. Peralta, supra*, 113 Cal. 38, 44, *Hufford v. Dye, supra*, 162 Cal. 147, 151, 159, and *Dannenbrink v. Burger* (1913) 23 Cal.App. 587, 595, the courts based the forfeiture on a historic practice that dated from many years prior to the filing of the lawsuit.  In *Bazet v. Nugget Bar Placers, Inc., supra*, 211 Cal. 607, the court held that forfeiture occurred when the defendant stored water, and thereby failed to use it beneficially, for a period of five years, during which persons with a riparian claim on the water were available to use it.  (*Id.* at pp. 617–618.)

[21] In seeking an earlier date of commencement for the five-year period, the plaintiff in *North Kern II* had argued "mere use by a junior appropriator can begin the

23

section 1241. (*Sagewillow*, at p. 674.) In deference to the legal maxim disfavoring forfeitures, Idaho courts have adopted a "resumption of use" doctrine holding that a five-year (or longer) period of nonuse does not work a forfeiture if " 'the original owner or appropriator resumed the use of the water prior to the claim of right by a third party.' " (*Ibid.*; see *Application of Boyer* (Idaho 1952) 248 P.2d 540, 544.) The plaintiff in *Sagewillow* had purchased land with appurtenant water rights allowing irrigation of over 2,000 acres, but for many years prior to the purchase the prior owner had irrigated only half that amount. (*Id.* at pp. 672–673.) Over the four years following the purchase, the plaintiff gradually expanded its irrigated acreage up to the full amount. The Idaho Department of Water Resources, responding to complaints by other landowners, declared a forfeiture and limited the plaintiff's water use to the amount irrigated by its predecessor. (*Id.* at p. 673.) On appeal, the court held that the plaintiff could not invoke the resumption of use doctrine if a junior appropriator had made a prior "claim of right" by putting the unused water to a beneficial use. (*Id.* at p. 675.) The court rejected the plaintiff's argument that a conflicting claim of right required the commencement of a legal proceeding or other formal action. (*Id.* at p. 677.) Reviewing Idaho decisions, the court found "[a] third party has made a claim of right to the water if the third party has either instituted proceedings to declare a forfeiture, [citation], or has obtained a valid water right authorizing the use of such water with a priority date prior to the resumption of use, [citation], or has used the water pursuant to an existing water right [citation]." (*Id.* at p. 680, fn. omitted.)

While California courts have never expressly adopted a "resumption of use" doctrine, our water law achieves the same result. As discussed above, in California there

---

period of measurement for forfeiture purposes," without the assertion of the type of formal claim required by the court, because "mere beneficial use of water by a junior appropriator constitutes a 'claim of right' to the water," citing *Sagewillow*. (*North Kern II, supra,* 147 Cal.App.4th at pp. 566–567.) The *North Kern II* court declined to consider the argument under the doctrine of law of the case, concluding the contention "directly conflicts with this court's prior holding that such use is permissive" in *North Kern I*. (*North Kern II*, at p. 567.)

is no forfeiture in the absence of a conflicting claim. As a result, a California rights holder whose water use falls below the full appropriation for five years or more may nonetheless resume full use at any time if no conflicting claim has been asserted in the meantime. This is the functional equivalent of Idaho's resumption of use doctrine. Moreover, such a "resumption of use" is precisely what Millview is seeking with respect to the Waldteufel claim: although all evidence suggests only minimal use was made of the Waldteufel claim for at least 30 years prior to Millview's license, Millview argues it is entitled to resume use of the full appropriation under the claim. We agree California law permits Millview to resume such use, but only if no conflicting claim was asserted during the period of nonuse.

The characterization of a conflicting claim in *Sagewillow* is consistent with California authority. (*Sagewillow, supra*, 70 P.3d at p. 680.) In general terms, a conflicting claim has been asserted if another claimant has actually appropriated the water otherwise covered by the original claim and has perfected that appropriation by making beneficial use of the surplus water, or has attempted to appropriate the water by instituting proceedings to establish a right—for example, in California, by seeking a permit from the Board to appropriate the surplus water or by commencing a legal action for a declaration of rights. (*Ibid.*; see, e.g., *Bazet v. Nugget Bar Placers, Inc., supra,* 211 Cal. at pp. 617–618 [defendant forfeited right to stored and unused water when others were willing to use water]; *Lindblom v. Round Valley Water Co., supra*, 178 Cal. at p. 452 [forfeiture found after plaintiff purchased land below dam and was prepared to use excess water]; *Santa Paula Water Works v. Peralta, supra*, 113 Cal. at pp. 42–43 [plaintiff had used defendant's unused water for nearly 20 years]; *Trimble v. Hellar, supra*, 23 Cal.App. at p. 444 [forfeiture occurs through "nonuse[] for a long period of time and the appropriation of the water meantime by another appropriator"].) So long as the original claimant's use of less than the full appropriation lasts for at least five years and does not end before the assertion of this type of conflicting claim, a forfeiture occurs.

Judged by this standard, we find no substantial evidence in the administrative record to support the Board's finding of forfeiture. In attempting to square its decision

25

with *North Kern II*, the Board found a clash of rights between Millview, on the one hand, and SCWA and Mendocino District. According to the Board, the clash of rights existed because increased diversion by Millview requires similarly increased dam releases, thereby "adversely affect[ing] SCWA's ability to store water" and conflicting with Mendocino District's "rights to store water." The exercise of these storage rights, however, does not constitute an appropriative use of water, which is required to create a conflicting claim that would preclude Millview's resumption of use. On the contrary, storage of water is not considered to be a beneficial use and cannot lead to the acquisition of a right of appropriative use. (*Lindblom v. Round Valley Water Co., supra*, 178 Cal. at p. 456.) Further, all summertime diverters from the Russian River have the same impact on SCWA's and Mendocino District's storage rights, since all create the need for compensatory releases of water. Unless Millview's right to resume use has been cut off by the claim of another to *use* of the Waldteufel rights, Millview is entitled to make the same demands on the watercourse as any other authorized user.

The Board's 1998 finding that the Russian River was fully appropriated is certainly suggestive, but it, too, fails to demonstrate the existence of a conflicting claim, at least standing alone. The finding of full appropriation represents a conclusion "no water remain[ed] available for appropriation" in 1998 (§ 1205, subd. (b)); however, it provides no information about who possessed the existing rights of appropriation and, in particular, how the Board evaluated the Waldteufel claim, if at all, in reaching its conclusion. If the Board based its finding of full appropriation on the assumption the Waldteufel claim was entitled to an appropriation of 15 afa, the finding would represent a ruling that the remaining allocation claimed by plaintiffs was subject to a conflicting claim in 1998. On the other hand, if the Board allocated a larger appropriation to the Waldteufel claim, or simply failed to consider it, the 1998 finding is less helpful. Either way, plaintiffs are entitled to the opportunity to evaluate and challenge any evidence relied on by the Board in reaching the conclusion a conflicting claim had been asserted.

In sum, if the Board is to declare a forfeiture of the Waldteufel claim, it can do so only upon evidence of a conflicting claim, as discussed above. The forfeiture doctrine

26

has been developed and applied primarily in relatively simple watercourses, in which one or two users claim the entire flow. We recognize that, in a large watercourse like the Russian River, determining whether a particular subsequent appropriation covers a prior, largely dormant claim may offer difficult issues of proof—particularly when consideration is given to public trust uses, which, although they cannot be the subject of a specific appropriation (*California Trout, Inc. v. State Water Resources Control Bd.* (1979) 90 Cal.App.3d 816, 821–822), must be taken into account in the allocation of water (§ 1243; see *Light, supra,* 226 Cal.App.4th 1463, 1489).[22] Nonetheless, however complex their application in a particular situation, the general requirements for a conflicting claim in California are well-defined.

## E. *The Riparian Nature of the Waldteufel Rights*

To acquire the right to appropriate water in the pre-1914 period, an owner of riparian land was required to establish the diversion of water for beneficial use on noncontiguous lands, as well as the quantity of water so used. (*Crane v. Stevinson* (1936) 5 Cal.2d 387, 398.) Because the Waldteufel parcel adjoined the river, Waldteufel was a riparian owner. Notwithstanding his posted notice, he could not perfect the Waldteufel claim as an appropriative water right without actually using the diverted water on noncontiguous land. As the Board noted, and as we discussed in connection with perfection of the claim, Millview failed to supply evidence of such use.

Plaintiffs argue they demonstrated a right to appropriate because Waldteufel *intended* to use the water on the remainder of Lot 103, which he did not own. The evidence on which they rely for divining his intent is uncertain, since the only apparent evidence of Waldteufel's intent, the notice, said he planned to use the water "upon the

---

[22] The public trust doctrine requires the Board to take certain public uses, such as navigation, recreation, and the preservation of wildlife habitat, into account when allocating water use. (*Audubon Society, supra*, 33 Cal.3d 419, 434, 446–447.) In *Audubon*, the leading case on the public trust doctrine, the Supreme Court held that the Board was not statutorily required to issue permits for the appropriation and beneficial use of all available water. By allowing some water to remain unappropriated, the Board could effectively allocate the water for public trust uses. (*Ibid.*)

27

lands owned by me." In any event, the mere intent to use water on noncontiguous lands, if not successfully implemented, would not perfect a pre-1914 claim of appropriation.

The SCWA argues we could affirm the Board's decision on this basis. As the Board noted, however, it did not raise this issue in the CDO notice. In the absence of such notice, the Board chose not to rely on plaintiffs' failure to provide evidence of appropriative use as a basis for its decision. Accordingly, we do not rely on that failure as a basis for affirming the CDO.

## F. *Due Process*

Plaintiffs argue the trial court's decision can be affirmed on the ground they were not provided a fair hearing by the Board because (1) they were not provided notice of the Board's theory that the Waldteufel claim was not "validly established," (2) the Board denied them discovery of information in its possession beyond that to be produced at the hearing, and (3) there were critical vacancies on the Board at the time of the decision.

The nature of plaintiffs' argument on the first point is unclear. To the extent plaintiffs intend "validly established" to refer to the Board's conclusion there was no evidence Waldteufel's claim was ever perfected as a right of appropriation, the claim was mooted when the Board elected not to rest its order on this conclusion. To the extent plaintiffs intend "validly established" to refer to the Board's finding that Waldteufel was not shown to have perfected a right to appropriate more than 243 afa, we conclude the notice was adequate. The "facts and information" section of the draft CDO states that Waldteufel "recorded a water right notice" in 1914 and Board staff had concluded it "likely has a valid basis." A conclusion the claim had a "valid basis" does not imply the claim had been perfected to the full extent claimed in Waldteufel's notice, thereby excluding that issue from consideration. The remainder of the section makes clear the Board's concern that historic use under the Waldteufel claim was not sufficient to support the full rights claimed by Millview. Included within such a concern is the possibility actual beneficial use was never sufficient to perfect the claim at the rate claimed by Waldteufel. Plaintiffs' subsequent presentation of expert testimony regarding

28

Waldteufel's likely water use under the claim demonstrates their understanding of their burden.

With respect to the denial of discovery, plaintiffs sought prehearing discovery from the Board with respect to "the Board's previous rights determinations on the West Fork of the Russian River" and the information on which the Board relied in concluding a portion of the Waldteufel claim was forfeited. In denying the application, the hearing officer noted plaintiffs could notice depositions (§ 1100) or subpoena documents from the Board (Gov. Code, § 11450.20) without prior approval and could inspect Board files, which are publicly available documents. As a result, the officer concluded plaintiffs could obtain the information from "a more convenient, less burdensome, and less expensive source." Further, the hearing officer left open the possibility of further discovery if this was insufficient.

We find no abuse of discretion and certainly no denial of due process. In arguing to the contrary, plaintiffs do not explain why the methods of investigation and discovery identified by the hearing officer were insufficient. Nor do they identify any particular information they were denied. Accordingly, there is no basis for concluding the denial of discovery was prejudicial.

As to plaintiffs' final due process claim, the Water Code requires the Board to be composed of four persons having specified water-related professional experience and one person who need not have "specialized experience." (§ 175.) At the time the CDO was entered, the two positions requiring a water law attorney and a water supply civil engineer were vacant. Plaintiffs argue they were denied due process by the absence of professional members, particularly a lawyer.

The Water Code authorizes a quorum of three members of the Board to transact business. (§ 181.) We find no legal basis for requiring a full Board. The sole case cited as authority by plaintiffs for their due process argument holds that a single member of a five-member board cannot properly transact business, clearly not the case here. (*Bandini Estate Co. v. Los Angeles* (1938) 28 Cal.App.2d 224, 229–230, disapproved on other grounds in *Universal Cons. Oil Co. v. Byram* (1944) 25 Cal.2d 353, 363.) Plaintiffs cite

29

no authority to support their argument that due process requires the board of a regulatory agency to include a lawyer when ruling on vested rights. Given the availability of judicial review for such decisions, we decline to impose such a requirement.

Finally, plaintiffs argue the trial court's decision must be affirmed unless appellants demonstrated a "miscarriage of justice," citing article VI, section 13 of the California Constitution.[23] The judicial standard of review for any particular decision represents an application of the constitutional standard for a miscarriage of justice; there is no further showing of injustice required. (E.g., *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801–802.) It may be, as Millview argues, that it will have difficulty supplying water to its customers if the Waldteufel claim is not given the full scope for which Millview argues, but restricting Millview to its lawful and properly established water rights is certainly within the Board's discretion. We note it was a lawsuit by plaintiffs that forced the Board's hand in issuing the notice of a proposed CDO.[24]

## G. *Remedy*

Code of Civil Procedure section 1094.5, which governs our review, states: "The [reviewing] court shall enter judgment either commanding respondent to set aside the order or decision, or denying the writ. Where the judgment commands that the order or decision be set aside, it may order the reconsideration of the case in light of the court's opinion and judgment and may order respondent to take such further action as is specially enjoined upon it by law, but the judgment shall not limit or control in any way the discretion legally vested in the respondent." Because we conclude the Board's order

---

[23] Plaintiffs also cite a Court of Appeal decision that was depublished by a grant of review after the filing of their brief, which we cannot consider.

[24] In its original memorandum responding to the citizen complaint, the Division did not recommend immediate enforcement action, and the Board took no action. Concerned that the memorandum created uncertainty about their exercise of the Waldteufel claim, plaintiffs sued the Board. Although the trial court denied the requested writ of mandate, concluding the Board had taken no action subject to judicial review, it suggested relief might be available at some future time if the Board did not "either disavow the conclusion of forfeiture or pursue a due process course to reviewable finality." Only after this ruling did the Board issue the notice of proposed CDO.

limiting Millview to diversion of 15 afa under the Waldteufel claim is not supported by the evidence, we must direct the Board to set aside the CDO and reconsider the case. In doing so, and without meaning to limit the Board's discretion in any way, we note three possible alternatives for the Board on remand, in addition to dismissal of the proceeding:

(1) The Board can set aside the present CDO and enter a new CDO limiting Millview's diversion under the Waldteufel claim to 243 afa, between the months of April and October. As noted above, the Board's finding that the claim was never perfected as an appropriative right, if at all, to any greater annual volume than 243 afa was supported by the evidence and consistent with water rights law;

(2) The Board can set aside the present CDO and conduct further evidentiary hearings on the issue of forfeiture. While there was no substantial evidence of a conflicting claim presented to the Board, such evidence might be developed; or

(3) The Board can begin again by issuing an amended notice of draft CDO addressing the issue of the perfection of the Waldteufel claim as a right of appropriation and conduct new administrative hearings directed at this issue, alone or in combination with the issue of forfeiture.

Citing *Newman v. State Personnel Bd.* (1992) 10 Cal.App.4th 41, and *Ashford v. Culver City Unified School Dist.* (2005) 130 Cal.App.4th 344, plaintiffs argue the Board should not be given the opportunity to conduct additional proceedings. In *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, the Supreme Court partially disapproved *Newman* and *Ashford*, essentially confining them to their facts, which concerned "disciplinary or punitive sanctions" imposed on a "fundamental or vested right." (*Voices of the Wetlands*, at pp. 534–535.) In essence, the court limited these rulings to writ review of administrative personnel decisions. Even assuming Millview has a "fundamental or vested right" to water under the Waldteufel claim, the purpose of the Board's proceeding was not to impose sanctions by impairing that right, but rather to determine whether the right exists and, if so, the extent of the right. Under Code of Civil Procedure section 1094.5, the Board is entitled to a remand to reconsider its decision on that issue under the guidance of this court's decision.

## III.  DISPOSITION

The Board is directed to set aside the CDO and reconsider the matter in light of this decision.

 

 

_____
Margulies, Acting P. J.

We concur:


_____
Dondero, J.


_____
Banke, J.

Trial Court:   Mendocino County Superior Court

Trial Judge:   Hon. Leslie D. Nichols (Retired Judge of the Santa Clara Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Counsel:

Kamala D. Harris, Attorney General, Robert W. Byrne, Assistant Attorney General, Gavin G. McCabe and William Jenkins, Deputy Attorneys General for Defendant and Appellant State Water Resources Control Board.

Bartkiewicz, Kronick & Shanahan, Alan B. Lilly, Andrew J. Ramos; Bruce Goldstein, County Counsel and Cory W. O'Donnell, Deputy County Counsel for Intervener and Appellant Sonoma County Water Agency.

Law Office of Michael R. Woods and Michael R. Woods for Intervener and Appellant Mendocino County Russian River Flood Control and Water Conservation Improvement District.

Neary and O'Brien, Christopher J. Neary and Jennifer O'Brien for Plaintiffs and Respondents Millview County Water District.

Carter, Momsen & Knight, Jared G. Carter, Matisse M. Knight and Alexander C. Rich for Plaintiffs and Respondents Steven L. Gomes and Thomas P. Hill.